UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BRANDON KEITH JACKSON, | Civil Action |
| Plaintiff, | No. 17-cv-13503 |
| v. | Section "S"(5) |
| ROBERT C. TANNER, ET AL., | |
| Defendants. | |

**RESPONSE TO MOTION TO FOR SUMMARY JUDGMENT**

Brandon Keith Jackson respectfully responds to Defendants' Motion for Summary Judgment as follows:

**INTRODUCTION**

Defendants' motion reads more like a Rule 12(b)(6) motion to dismiss than a Rule 56(a) motion for summary judgment.

1.    Defendants argue Mr. Jackson failed to exhaust certain of his claims.  Exhaustion is a threshold issue that deserves to be decided at the outset of a case.  Defendants could have raised the issue of exhaustion in their prior-filed motions to dismiss.  In any event, existing evidence shows Defendants had a fair opportunity to address Mr. Jackson's claims.

2.    Defendants argue Dr. Cleveland was not deliberately indifferent to Plaintiff's serious medical needs.  But they do not dispute that Dr. Cleveland, as RCC's medical director, was responsible for Mr. Jackson's care, or that he knew that Mr. Jackson's mental state was fragile.  The existing evidence shows that during the time period in question Dr. Cleveland ignored Mr. Jackson's numerous formal requests to speak to a mental health professional.

3.    Defendants argue Mr. Jackson's ADA claim is without merit.  But they cannot credibly contend that Mr. Jackson's disability is "qualifying," and the existing evidence shows not only that RCC ignored Mr. Jackson's numerous formal requests for mental health treatment but punished him for, and aggravated, his conditions by subjecting him to isolation, provocations, and threats.

4.    Defendants argue Warden Tanner was not personally involved.  They made the same argument in a prior-filed motion to dismiss but offer nothing new here.

5.    Defendants argue Mr. Jackson fails to state a claim for retaliation.  They offer no evidence in support.  They ignore a chronology of events from which retaliation may be plausibly inferred.

6.    Defendants argue Mr. Jackson's claims are fanciful.  They made the same argument in prior filed motions to dismiss.  Nothing has changed since the Court denied those motions. Admittedly, the alleged facts are bizarre—but the gaps in Defendants' own video evidence are bizarre, too.

7.    Defendants argue they are entitled to qualified immunity.  Qualified immunity also is a threshold issue that deserves to be decided at the outset of a case.  Defendants could have raised the issue of qualified immunity in their prior-filed motions to dismiss.  In any event, here they have merely asserted that the doctrine applies; they have not shown any basis for it.  Regardless there is no qualified immunity for any violation of the ADA.

8.    Finally, Defendants argue Mr. Jackson is not entitled to prospective injunctive relief. Because Mr. Jackson has not asked for prospective injunctive relief, the Court need not decide whether he is entitled to it.

Below Mr. Jackson summarizes the applicable law and more fully addresses Defendants' arguments, in the order Defendants make them.

## APPLICABLE LAW

### Summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

### Exhaustion

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 … by a prisoner … until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a). "A prisoner exhausts all available administrative remedies for a claim only if he or she (1) completes the prison's grievance process (2) in a manner 'sufficiently specific to give "officials a fair opportunity to address the problem that will later form the basis of the lawsuit." ' " *Petzold v. Rostollan*, 946 F.3d 242, 254 (5th Cir. 2019) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007)).

### Qualified immunity

"Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (citation omitted). "Courts use a two-prong analysis to determine whether a defendant is entitled to qualified immunity in a given case. The court must decide both whether the plaintiff has alleged a violation of a constitutional right and whether that right was 'clearly established' at the time of the incident." *Orr v. Copeland*, 844 F.3d 484, 492 (5th Cir. 2016). The court may address these questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

**Qualified immunity—summary judgment**

"'A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof,' shifting it to the plaintiff to show that the defense is not available." *Cass*, 814 F.3d at 728 (citation omitted). "The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

"In conducting the qualified immunity analysis, [the court] 'may not resolve genuine disputes of fact in favor of the party seeking summary judgment.'" *Trent v. Wade*, 776 F.3d 368, 377 (5th Cir. 2015) (citation omitted). "If resolution of [qualified immunity] in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability . . . , and if there are conflicting versions of his conduct, one of which would establish and the other defeat liability, then the case is inappropriate for summary judgment." *Haverda v. Hays Cty.*, 723 F.3d 586, 599 (5th Cir. 2013) (quoting *Barker v. Norman*, 651 F.2d 1107, 1123–24 (5th Cir. 1981)).

**Eighth Amendment—unreasonable conditions of confinement (Count 1)**

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (citation omitted).

"To establish an Eighth Amendment violation based on the conditions of his confinement, a prisoner must satisfy both an objective and subjective component." *Garrett v. Thaler*, 560 F. App'x 375, 378 (5th Cir. 2014) (quoting *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995)). "First, he must show that his confinement resulted in a deprivation that was 'objectively, sufficiently serious.' " *Id.* (quoting *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008)). "In other words, the prisoner must demonstrate that the deprivation resulted in the denial of 'the minimal civilized measure of life's necessities.' " *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "Second, to satisfy the subjective component, prison officials must have been deliberately indifferent to the alleged conditions and hence possessed a sufficiently culpable state of mind." *Id.* (quoting *Wilson*, 501 U.S. at 297–303; *Woods*, 51 F.3d at 581).

### Eighth Amendment—deliberate indifference to a serious medical need (Count 2)

"The standard for proving an Eighth Amendment claim for the deprivation of psychiatric care is the same as that used when considering medical care claims, *i.e.* a prisoner must show that appropriate care has been denied, and that the denial constituted 'deliberate indifference to serious medical needs.' " *Dockery v. Hall*, 443 F. Supp. 3d 726, 741 (S.D. Miss. 2019), *aff'd sub nom. Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021). "[T]o be found to have acted with deliberate indifference, a prison official must (1) 'know[ ] that inmates face a substantial risk of serious bodily harm,' and (2) 'disregard[] that risk by failing to take reasonable measures to abate it.' " *Id.* (citations omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Anderson v. Wilkinson*, 440 F. App'x 379, 381 (2011) (internal citation omitted; citing also LaFave & Scott § 3.7, p. 335 ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the

defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of….")).

### Eighth Amendment—excessive use of force (Count 3)

"To decide an Eighth Amendment claim based on excessive force, a court must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Santos v. White*, 18 F.4th 472, 475 (5th Cir. 2021) (*Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

### Retaliation for exercise of a constitutional right (Count 4)

"Filing a grievance is a constitutionally protected activity." *Huff v. Thaler*, 518 F. App'x 311, 312 (5th Cir. 2013).  "A prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct."  *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995).

"To state a valid claim for retaliation under [S]ection 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018) (quoting *Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008) (quoting *Jones v. Greninger*, 188 F.3d 322, 324–25 (5th Cir. 1999))). "To show causation, a plaintiff must allege that 'but for the retaliatory motive the complained of incident ... would not have occurred.' " *Id.* (quoting *Woods*, 60 F.3d at 1166). "A plaintiff must either 'produce direct evidence of motivation' or 'allege a chronology of events from which retaliation may plausibly be inferred.' " *Id.* (quoting *Woods*, 60 F.3d at 1166).

### The ADA (Count 5)

Title II of the Americans with Disabilities Act ("ADA") provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  A prison's failure to attend to the medical needs of a disabled inmate can violate the ADA. "The Supreme Court has held that prisons are public entities that may not exclude disabled individuals from participation in or deny them the benefits of their services, programs, or activities." *Cadena v. El Paso Cty.*, 946 F.3d 717, 723 (5th Cir. 2020) (citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)).

"To make out a prima facie case under [the ADA], a plaintiff must show '(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.' " *Cadena v. El Paso Cty.*, 946 F.3d 717, 723–24 (5th Cir. 2020) (quoting *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)).

### Fourteenth Amendment—discrimination (Count 6)

The Fourteenth Amendment's equal protection clause prohibits prisons from treating prisoners unfairly compared to other prisoners without adequate justification. *Hilliard v. Bd. of Pardons & Paroles*, 759 F.2d 1190, 1193 (5th Cir. 1985) ("This is an equal protection claim because it alleges that, without adequate justification, he was treated unfairly compared to other prisoners who were similarly situated. When this occurs, equal protection may be violated even though the differential treatment does not relate to a substantive constitutional right.") (citations omitted).

### Supervisory liability (Count 7)

A supervisor may be held liable for failure to supervise or failure to train if: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to

train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009). A supervisor may be held liable for constitutional violations committed by subordinate employees where "(1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).

"[I]n the context of the ADA, if not for purposes of the Eighth Amendment, 'intentional discrimination against the disabled does not require personal animosity or ill will'; 'it may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy . . . or custom.' " *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 737 (M.D. La. 2016) (citations omitted).

## ARGUMENT

### 1. "Plaintiff failed to exhaust administrative remedies." (Counts 2, 3, 4, and 6)

In support of their argument that Mr. Jackson failed to exhaust administrative remedies as to Counts 2, 3, 4, and 6, Defendants point to "ARP records" for three handwritten grievances that they attach as their own Exhibit G. See Doc. 97-6.  The grievances are dated July 11, 2017, July 31, 2017, and September 30, 2018.

Setting aside whether Defendants properly construe the three grievances, Defendants' ARP records were not previously disclosed and are incomplete.

### a. Defendants' ARP records were not previously disclosed and are incomplete.

Undersigned counsel is seeing some of these ARP records for the very first time.  She has been unable to find where, in the now five years that this case has been pending, that Defendants previously produced ARP records for the September 30, 2018 grievance.  See attached Exhibit F.

Undersigned counsel reviewed prior counsel's files, including materials from RCC and Defendants' own motions to dismiss prior filed complaints, before drafting Mr. Jackson's second amended complaint (the operative complaint) last year.  Every allegation in Mr. Jackson's second amended complaint has a source document.  If Defendants had previously argued exhaustion, undersigned counsel would have accounted for it. Nothing requires Defendants to argue exhaustion at the outset of a case but given the defense's capacity to easily dispose of entire claims, it stands to reason a defendant would not wait so long to raise it.

That said, unfortunately, as presented here, Defendants' exhaustion argument raises more questions than it answers.  Defendants represent that Mr. Jackson filed only three grievances during the relevant time period.  Doc. 97-1 at 14 ("Ms. Sumrall identified three ARPs that were filed during July and August 2017 and October 2018.").  But among the materials undersigned counsel reviewed before she drafted Mr. Jackson's second amended complaint is a handwritten grievance dated November 27, 2017.  Defendants' exhaustion argument, indeed their own affiant Ms. Sumrall, see Doc. 97-5, do not account for the November 27, 2017 grievance.  This fact alone is sufficient to raise a genuine dispute of material fact as to whether Defendants are entitled to summary judgment on any of Mr. Jackson's claims on the alleged basis that he failed to exhaust administrative remedies.

At a minimum, Defendants should be required to diligently search for and produce any ARP records relating to Mr. Jackson in their possession.  Mr. Jackson made written discovery requests of Defendants, including requests for production of "any documents constituting, evidencing, or relating to any statement or interview of any person concerning any facts relating to allegations in the amended complaint," on November 8, 2021.  As these ARP records show, Defendants apparently still have not produced all responsive documents requested of them.

In the meantime, existing ARP records show Defendants had a fair opportunity to address Mr. Jackson's claims.

**b. Defendants had a fair opportunity to address Mr. Jackson's claims.**

Mr. Jackson agrees that, of the three grievances that comprise Defendants' Exhibit G, the July 11, 2017 grievance (ARP 2017-518) is not relevant here.

The July 31, 2017 grievance (ARP 2017-573) is relevant: It summarizes the July 17, 2017 and July 24, 2017 incidents, involving Goings and Spears, respectively; requests Warden Tanner's review; and specifically asks that "all corrupt officers involved" be fired. See attached Exhibit A.1 (also Doc. 97-6 (Defendant's Exhibit G) at 18-19). Notation at the top of the pages suggests that the matter was assigned to "Mjr Darryl Mizell."

The September 30, 2018 grievance (ARP 2018-719) also is relevant: It specifically alleges that Goings "is retaliating on me for filing a lawsuit." See attached Exhibit A.4 (also Doc. 97-6 (Defendant's Exhibit G) at 38-39). It specifically describes an incident in which Goings said to Mr. Jackson "I've been waiting for you to f*** up" and then "began to punch [Mr. Jackson] in the face over and over and made [his] nose bleed." Goings also "grabbed [Mr. Jackson's] leg shackles so hard that [he] fell and hit the floor hard and hit[ his] head."

In addition, the November 27, 2017 grievance (ARP 2017-869), which Defendants omit from their argument and Ms. Sumrall omits from her affidavit, is relevant: It specifically alleges that Dr. Cleveland "decided to take [Mr. Jackson] off of his mental health medication" and he "refuse[d] to accept the recommendation of … [Mr. Jackson's] mental health doctor." See attached Exhibit A.2.

In view of these known grievances, along with other source documents which indicate other grievances, Defendants had a fair opportunity to address claims which form the bases of Counts 2, 3, 4, and 6.

**i. Count 2**

In Count 2, Mr. Jackson alleges Dr. Cleveland "knew of and disregarded an excessive risk to Mr. Jackson's health and safety by withholding medical treatment for Mr. Jackson's serious mental

health conditions." Mr. Jackson seeks declaratory and injunctive relief only against Warden Bickham, because he is the current warden of RCC and oversees RCC's operations.

The November 27, 2017 grievance (ARP 2017-869) was "sufficiently specific to give officials a fair opportunity to address the problem that [would] later form the basis of" Count 2. *Petzold*, 946 F.3d at 254. Indeed, RCC itself summarized the grievance: "Claims he is not receiving appropriate medical care."

### ii.   Count 3

In Count 3, Mr. Jackson alleges that on October 1, 2018, Goings and Spears "beat Mr. Jackson so badly he had a black eye for days" and that Major Mizell either did not bother to investigate, or he investigated but concealed his findings." Again, Mr. Jackson seeks declaratory and injunctive relief only against Warden Bickham, because he is the current warden of RCC and oversees RCC's operations.

The source document for Mr. Jackson's allegation is a memo dated October 2, 2018 from RCC employee Lisa Jenkins to Mr. Jackson, with the subject line "Alleged Retaliation," which states that that "Warden Tanner is referring your letter … for further handling." The memo plainly indicates that Mr. Jackson reported "Alleged Retaliation" to RCC in a letter. To undersigned counsel's knowledge, Defendants have never produced that letter. Nevertheless, the memo attaches disciplinary reports that describe the specific alleged incident on October 1, 2018. See attached Exhibit A.5.

In addition, the September 30, 2018 grievance (ARP 2018-719) attached to Defendants' motion—which undersigned counsel did not have at the time she drafted the second amended complaint—specifically alleges that Goings "is retaliating on [Mr. Jackson] for filing a lawsuit" by, among other things, beating him so hard he "made [his] nose bleed." Although the grievance describes a different incident on September 26, 2018, given its prior unavailability to counsel, the Court might

properly consider it in determining whether, for his excessive force claim against Going, Mr. Jackson exhausted his administrative remedies.

These documents were "sufficiently specific to give officials a fair opportunity to address the problem that [would] later form the basis of" Count 3. *Petzold*, 946 F.3d at 254.

### iii.    Count 4

In Count 4, Mr. Jackson alleges Goings, Spears, Major Mizell, and Dr. Cleveland "have viewed and treated Mr. Jackson as a problem and have intentionally retaliated against him."

Mr. Jackson specifically alleges that he was "confined to a cell for 23 hours and 50 minutes a day"; that Goings and Spears "beat [him] so badly he had a black eye for days"; that Major Mizell either did not bother to investigate, or he investigated but concealed his findings"; and that Dr. Cleveland has withheld medical treatment for his serious mental health condition.  Again, Mr. Jackson seeks declaratory and injunctive relief only against Warden Bickham, because he is the current warden of RCC and oversees RCC's operations.

The source documents for these allegations are a letter from Mr. Jackson to the Court, docketed on July 16, 2018, Doc. 20; the memo dated October 2, 2018, summarized above, which indicates that Mr. Jackson reported "Alleged Retaliation" to RCC in a letter; and numerous healthcare request forms in which Mr. Jackson begged to see a mental health doctor.  In addition, given its prior unavailability to counsel, the Court might properly consider the September 30, 2018 grievance (ARP 2018-719) attached to Defendants' motion.

These documents were "sufficiently specific to give officials a fair opportunity to address the problem that [would] later form the basis of" Count 4. *Petzold*, 946 F.3d at 254.

### iv.    Count 6

In Count 6, Mr. Jackson alleges Goings, Spears, Major Mizell, and Dr. Cleveland have treated Mr. Jackson unfairly compared to other prisoners, without adequate justification, "because he has a serious mental health condition and because he has filed his grievances."

Mr. Jackson specifically alleges that RCC "has unfairly subjected Mr. Jackson to isolation"; Goings and Spears "have unfairly subjected Mr. Jackson to threats and provocations, knowing that Mr. Jackson's serious mental health conditions made him sensitive to them, and to harassment including the use of excessive force"; Major Mizell either "did not bother to investigate, or he investigated but concealed his findings"; and Dr. Cleveland "has unfairly withheld from Mr. Jackson medical treatment for his serious mental health conditions." Again, Mr. Jackson seeks declaratory and injunctive relief only against Warden Bickham, because he is the current warden of RCC and oversees RCC's operations.

The source documents for these allegations are, again, a letter from Mr. Jackson to the Court, docketed on July 16, 2018, Doc. 20; the memo dated October 2, 2018, summarized above, which indicates that Mr. Jackson reported "Alleged Retaliation" to RCC in a letter; and the November 17, 2017 grievance (ARP 2017-869), along with numerous healthcare request forms in which Mr. Jackson begged to see a mental health doctor. In addition, given its prior unavailability to counsel, the Court might properly consider the September 30, 2018 grievance (ARP 2018-719) attached to Defendants' motion.

These documents were "sufficiently specific to give officials a fair opportunity to address the problem that [would] later form the basis of" Count 6. *Petzold*, 946 F.3d at 254.

## 2.   "Dr. Cleveland was not deliberately indifferent to Plaintiff's serious medical needs." (Count 2)

In Count 2, Mr. Jackson alleges Dr. Cleveland "knew of and disregarded an excessive risk to Mr. Jackson's health and safety by withholding medical treatment for Mr. Jackson's serious mental health conditions."

Defendants argue Dr. Jackson was not deliberately indifferent to Mr. Jackson's serious medical needs.  Defendants are correct that deliberate indifference is an "extremely high standard to meet." Doc. 97-1 at 18 (quoting *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)).  A defendant must "know of an excessive risk to inmate health or safety and deliberately disregard[] that risk."  Doc. 97-1 at 19 (citing *Farmer*, 511 U.S. at 836).

But Defendants mischaracterize Mr. Jackson's claim as simply "withholding medical treatment, specifically Wellbutrin," and "not providing appropriate medical attention on July 24, 2017."  Doc. 97-1 at 19.  Mr. Jackson does allege that Dr. Cleveland withheld Wellbutrin from him, and that Dr. Cleveland failed to provide appropriate medical attention on July 24, 2017—but Mr. Jackson's claim is more than those two allegations.  Mr. Jackson broadly alleges that he suffers serious mental health conditions including anti-social disorder, bipolar disorder, depression, and anxiety, and that during the time period in question he begged repeatedly, among other things, to see a mental health professional.

Defendants argue simply that "disagreement with [] medical care does not establish [deliberate indifference]."  Doc. 97-1 at 19.  That argument might address the allegations that Dr. Cleveland withheld Wellbutrin from Mr. Jackson and that Dr. Cleveland provided insufficient medical attention on July 24, 2017.  But it does not address the broader allegation that Dr. Cleveland ignored Mr. Jackson's repeated requests to see a mental health professional.

Defendants do not dispute that Dr. Cleveland, as RCC's medical director, was responsible for Mr. Jackson's medical care, including his mental health care.  (Indeed, Dr. Cleveland signed RCC's

"Mental Health Care" directive as RCC's Healthcare Authority.  See attached Exhibit D.2.) They do not dispute that Dr. Cleveland knew that Mr. Jackson's mental state was fragile.  They offer no evidence at all, much less evidence which would entitle them to summary judgment on the allegation that Dr. Cleveland ignored Mr. Jackson's repeated requests to see a mental health professional.

"[A] plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).  Here, the existing evidence shows that between the July 24, 2017 incident and his mother's passing on September 7, 2017, Mr. Jackson made at least five formal requests to speak to a mental health professional.[1]  After his mother's passing on September 7, 2017, Mr. Jackson's pleas became more urgent.  Between September 7, 2017 and March 5, 2018, he made more than a dozen formal requests to speak to a mental health professional, including in a personal letter to Dr. Cleveland.[2]

---

[1] See attached Exhibit B: 2017-07-30 Healthcare Request Form ("I need to talk with mental health doctor"); 2017-07-31 Healthcare Request Form ("and the mental health doctor cause I am having serious problems"); 2017-08-10 Healthcare Request Form ("Serious mental problems, anxiety, paranoid. I need to see medical doctor and mental doc"); 2017-08-13 Healthcare Request Form ("I have anxiety, paranoid, can't eat. … Mental Problem. I need to see doctors I need help."); 2017-08-28 Healthcare Request Form ("I need to see mental health doctor"); 2017-08-29 Doctor's Call Form ("Anxiety & paranoid. Mental health med review.").

[2] See attached Exhibit B: 2017-09-11 Healthcare Request Form ("I need to see mental health doctor"); 2017-09-17 Healthcare Request Form ("I need to see mental health too. Thanks …"); 2017-10-25 Doctor's Call Form ("wants to see mental health"); 2017-11-15 Healthcare Request Form ("I need to see mental health doctor because my medication is out"); 2017-11-19 Healthcare Request Form ("I need to see mental health because my medication ran out"); 2017-11-27 Healthcare Request Form ("Doctor Cleveland took me off my mental health medications Wellbutrin. I seen mental health doctor a few months ago and she told me he has to be the one to re-order that medication, and said that I needed that medication for my problems."); 2017-12-03 Healthcare Request Form ("I need to see Doctor Cleveland so he could reorder my Wellbutrin 150mgs 3x a day, mental health told me he has to be the one to put me back on it."); 2017-12-12 Brandon Jackson letter to Dr. Robert Cleveland ("I really need that medication sir …"); 2017-12-13 Healthcare Request Form ("I need to see mental health. I need to see the mental health doctor also."); 2017-12-17 Healthcare Request Form ("I need to see doctor about my chronic pain and my mental health. I need him to give me the medication that works for my problems."); 2017-12-26 Healthcare Request Form ("I talked to Doctor Cleveland about putting me back on my mental health medication Wellbutrin because mental health told me she will leave it up to Doctor Cleveland because he was the doctor to take me off. So I need to see him about that too."); 2018-01-16 Healthcare Request Form ("I need to see the mental health doctor so I could get back on my right mental health. I need to see the doctor so he could put me back on my mental health medication Wellbutrin."); 2018-02-04 Healthcare Request Form ("I need to see mental health doctor"); 2018-02-06 Doctor's Call Form ("wants to see foot doctor and MD regarding mental health meds."); 2018-03-05 Healthcare Request Form ("I need mental health doctor").

Dr. Cleveland ignored Mr. Jackson.  Defendants are not entitled to summary judgment on Count 2.

### 3. "Plaintiff's claim for relief asserted under the ADA/RA is without merit." (Count 5)

In Count 5, Mr. Jackson alleges LA DPS&C, through RCC's employees, has discriminated against Mr. Jackson "on the basis of his serious mental health conditions, with the tragic result that they have punished him for, and aggravated, his disability," in violation of the Americans with Disabilities Act and Rehabilitation Act (collectively, the ADA).

Defendants do not dispute that a prison's failure to attend to the medical needs of a disabled inmate can violate the ADA. In fact, in accordance with the ADA, it is LA DPS&C's stated policy that "[d]iscrimination on the basis of an offender's disability in making administrative decisions … shall be prohibited."  See attached Exhibit D.1.

Defendants instead argue Mr. Jackson does not have a "qualifying disability" because he "fails to offer a single allegation to describe how his 'mental health issues' prevented him from caring for himself, walking, seeing, hearing, speaking, breathing, learning, or working."  Doc. 97-1 at 21.

Defendants do not and cannot dispute that Mr. Jackson suffers "serious mental health conditions including anti-social disorder, bipolar disorder, depression, and anxiety."  They offer no evidence that Mr. Jackson's serious mental health conditions do not impair his major life activities. Existing evidence shows Mr. Jackson's serious mental health conditions do impair his major life activities.[3]  See, e.g., *Epley v. Gonzalez*, 860 F. App'x 310, 313 (5th Cir. 2021) ("Epley has alleged sufficient facts that, when considered in the light most favorable to him, demonstrate that his PTSD

---

[3] See attached Exhibit B: 2017-07-31 Healthcare Request Form ("I am having serious problems"); 2017-08-10 Healthcare Request Form ("Serious mental problems, anxiety, paranoid."); 2017-08-13 Healthcare Request Form ("I have anxiety, paranoid, can't eat. … Mental Problem."); 2017-08-29 Doctor's Call Form ("Anxiety & paranoid. Mental health med review."); 2017-12-17 Healthcare Request Form ("I can not do my day to day activities without the meds that works for my body.").

and TBI substantially limit his ability to think and sleep.  In addition to describing the symptoms that these conditions cause—which include 'migraine attacks, confusion during stressful situations, sleeping disturbances, ... anxiety and panic attacks, vivid and distressing flashbacks and nightmares'— his factual allegations illustrate how these conditions affected his life at the time of the underlying incident.").

Defendants also argue Mr. Jackson "makes no allegations that he has been denied mental health treatment."  Doc. 97-1 at 21.  But that representation is false: Mr. Jackson not only alleges, the evidence shows, that between the July 24, 2017 incident and his mother's passing on September 7, 2017, Mr. Jackson made at least five formal requests to speak to a mental health professional.[4]  After his mother's passing on September 7, 2017, Mr. Jackson's pleas became more urgent.  Between September 7, 2017 and March 5, 2018, he made more than a dozen formal requests to speak to a mental health professional, including in a personal letter to Dr. Cleveland.[5]  RCC's employees ignored Mr. Jackson.[6]

Defendants argue "the ADA is not violated by a [prison's] simply failing to attend to the medical needs of its disabled [prisoners]."  Doc. 97-1 at 22.  But Defendants too narrowly construe Mr. Jackson's claim.  Mr. Jackson does not allege simply that RCC's employees failed to attend to his mental health—but more importantly that they punished him for, and aggravated, his serious mental health conditions by subjecting him to isolation, provocations, and threats, knowing that he was especially sensitive to such things.  Doc. 61 at ¶¶ 98-102.

Defendants do not at all address those plain allegations, much less offer evidence to contradict them.  Defendants are not entitled to summary judgment on Count 5.

---

[4] See attached Exhibit B.

[5] See attached Exhibit B.

[6] RCC's mental health records for Mr. Jackson are dense (750+ pages, many hard to read, and not always in chronological order) and span decades (2004 to present).  Based on undersigned counsel's review, it appears that there are no records of mental health care between approximately April 2017 and approximately July 2019.

4. **"Plaintiff makes no claim that Warden Tanner was personally involved in any alleged act or omission upon which his claims of failure to train or supervise are based." (Count 7)**

In Count 7, Mr. Jackson alleges Warden Tanner "failed to train Goings, Spears, and Dr. Cleveland on how to deal with inmates with serious mental health conditions and on their obligations under the ADA"; "failed to train Major Mizell on his duties to investigate incidents at RCC, including the July 17, 2017 and July 24, 2017 incidents involving Mr. Jackson"; and "failed to supervise Goings's, Spears's, and Dr. Cleveland's interactions with Mr. Jackson, with the tragic result that they have been permitted to punish Mr. Jackson for, and aggravate, his disability."

Defendants argue Mr. Jackson "makes no allegation that Defendant played any role in any of the alleged constitutional violations." Doc. 97-1 at 24. More specifically, Defendants argue: "The substance of Plaintiffs operative complaint and the facts at issue do not show" that Warden Tanner "was ever personally involved in examining, evaluating, or treating Plaintiff's medical complaints," Doc. 97-1 at 26, or "was ever personally involved in the day-to-day logistics of investigating Plaintiff's ARP," Doc. 97-1 at 27.

Defendants made the same argument in a prior-filed motion to dismiss. Doc. 70-1 at 11. To be clear, Mr. Jackson alleges Warden Tanner "oversaw RCC's operations and was responsible for the health and safety of inmates at RCC, including Mr. Jackson." Doc. 61 at ¶ 116. "As RCC's chief supervisor, [he] had a duty to train and supervise RCC's employees." Doc. 61 at ¶ 116. He failed to train Goings, Spears, and Dr. Robert Cleveland on "how to deal with inmates with serious mental health conditions," Doc. 61 at ¶ 117, and "their obligations under the ADA," Doc. 61 at ¶ 118, and failed to supervise their "interactions with Mr. Jackson," Doc. 61 at ¶ 120. He failed to train Major Mizell on "his duties to investigate incidents at RCC." Doc. 61 at ¶ 119. His failures "constituted deliberate indifference," Doc. 61 at ¶ 121, "with the tragic result that [Defendants] have been permitted to punish Mr. Jackson for, and aggravate, his disability," Doc. 61 at ¶ 120, and discovery

will show "a pattern of similar constitutional violations by [Defendants and others] such that [he, Tanner] had actual or constructive notice [of these abuses]," Doc. 61 at ¶ 121. Tanner's failures constituted "both a tacit approval of, or acquiescence in, [Defendants'] conduct and a repudiation of the rights and dignity of Mr. Jackson.  Because [he] allowed [Defendants] to act with impunity, [he, Tanner] himself was a moving force behind their constitutional violations." Doc. 61 at ¶ 122. Defendants do not at all address those plain allegations, much less offer evidence to contradict them.

Mr. Jackson has not had an adequate opportunity to develop facts which might support his claims because Defendants failed, for months, to respond to either Mr. Jackson's written discovery requests or requests for dates for depositions.  But for Mr. Jackson's filing a motion to compel on March 5, 2022, see Doc. 88, Defendants likely never would have responded to Mr. Jackson's written discovery requests.  Defendants still have not produced, among other things, documents responsive to Mr. Jackson's requests for production number 3, for Defendants' "personnel files"; number 8, for "any formal or informal complaints against you or RCC for failing to comply with the ADA"; and number 12, for "any formal or informal complaints against you or RCC for failing to provide mental health care."  See attached Exhibit F.  Apparently, pursuant to LA DPS&C policy, there exists an "ADA Database" from which such responsive information can be easily obtained.  See attached Exhibit D.1.

Nevertheless, "training transcripts" that Defendants produced on April 5, 2022, show that in all their years of employment, Goings, Spears, and Dr. Cleveland received no training at all on mental health or the ADA.  Major Mizell received training on "Mental Health," "Special Needs Offenders," and "Amer with Disab (ADA)"—but in 2021, years after the incidents in question. See attached Exhibit C.

Given existing evidence, Defendants' own argument's failure to address Mr. Jackson's allegations, Defendants' failure to support their argument with any evidence, and Defendants' failure

to produce documents responsive to Mr. Jackson's discovery requests, Defendants are not entitled to summary judgment on Count 7.

5. **"Plaintiff fails to allege, much less plead facts supporting, a viable claim for retaliation." (Count 4)**

In Count 4, Mr. Jackson alleges Goings, Spears, Major Mizell, and Dr. Cleveland "have viewed and treated Mr. Jackson as a problem and have intentionally retaliated against him."

Defendants argue Mr. Jackson "pleads no factual allegations showing that, 'but for' the filing of his grievances, that Defendants' caused Plaintiff harm." Doc. 97-1 at 28.

Mr. Jackson alleges a chronology of events from which retaliation may plausibly be inferred: "As is his right, Mr. Jackson [] filed several grievances against RCC, Spears, and Goings. These include his objections to his sentences for the July 17, 2017 and July 24, 2017 incidents, his complaint in this Court on November 22, 2017, and numerous pointed requests for healthcare, specifically for mental healthcare." Doc. 61 at ¶ 81.  After, "RCC, and specifically Goings, Spears, and Dr. Cleveland, [] viewed and treated Mr. Jackson as a problem and [] intentionally retaliated against him." Doc. 61 at ¶ 82.  "RCC [] subjected Mr. Jackson to retaliation in the form of isolation.  In a letter addressed to the Court's clerk, docketed on July 16, 2018, Mr. Jackson represented that he was 'being confined to a cell for 23 hours and 50 minutes a day only being allowed to exit the cell for shower.'" Doc. 61 at ¶ 83. "Goings and Spears [] subjected Mr. Jackson to retaliation in the form of harassment and excessive use of force.  On October 1, 2018, RCC officers Goings and Spears beat Mr. Jackson after he put a piece of paper in his mouth.  The beating was so bad Mr. Jackson had a black eye for days." Doc. 61 at ¶ 84.  "Dr. Cleveland [] subjected Mr. Jackson to retaliation in the form of withholding from him medical treatment for his serious mental health condition." Doc. 61 at ¶ 86.  "But for his exercise of his right to file his grievances, RCC, Goings, Spears, and Dr. Cleveland would not have subjected Mr. Jackson to these torments." Doc. 61 at ¶ 87.  "At all relevant times, Major Mizell oversaw

investigations at RCC and was responsible for investigating incidents involving Mr. Jackson. Either he did not bother to investigate, or he investigated but concealed his findings.  Either way, his acts or failures to act provided cover for Goings and Spears and were a foreseeable contributing factor to the violations of Mr. Jackson's constitutional rights." Doc. 61 at ¶ 88.

Defendants do not at all address those plain allegations, much less offer evidence to contradict them.  Defendants are not entitled to summary judgment on Count 4.

### 6. "Plaintiff's claims against Defendants Goings and Spears are factually frivolous." (Count 1)

In Count 1, Mr. Jackson alleges that "Goings knew that Mr. Jackson suffers serious mental health conditions yet Goings relished in tormenting Mr. Jackson, including by threatening to kill his mother if he did not ingest insect repellent on July 17, 2017," and that "Spears knew that Mr. Jackson suffers serious mental health conditions yet Spears relished in tormenting Mr. Jackson, including by giving him a razor blade and telling him to kill himself on July 24, 2017."

Defendants argue Mr. Jackson's allegations are "fanciful" and "fantastic."  Doc. 97-1 at 29-35. Defendants made the same argument in 2018. See Doc. 10-1 at 9-13.  In fact, they cut the same argument from their prior-filed motion to dismiss and pasted it into the instant motion for summary judgment, but without offering any evidence in support.

Admittedly, the alleged facts are bizarre—but the gaps in Defendants' video evidence are bizarre, too.

Defendants represent that "video evidence proves" that "Plaintiff possessed the can of bug spray prior to being placed in his cell" on July 17, 2017.  Actually, the video evidence shows RCC officer Michael Dillon escorting Mr. Jackson to the cell and conducting a strip search of Mr. Jackson's body and its cavities. If Mr. Jackson had been carrying a spray can, Dillon certainly would have discovered it.  The same camera that recorded the video to which Defendants refer also would have

recorded any comings and goings prior to the incident.  The video that Defendants produced, however, suspiciously omits that time period.  Undersigned counsel has repeatedly asked, in written discovery requests as well as in letters to opposing counsel, for any recordings, in their complete unedited format, of Jackson for the 24 hours before and after the July 17, 2017 incident described in the amended complaint.  No one has responded to her requests.  See attached Exhibit F.

Defendants contend Mr. Jackson never swallowed a razor blade on July 24, 2017.  Doc. 97-1 at 33 ("no such thing occurred").  But the x-ray was not conclusive, and subsequent medical records reflect that Mr. Jackson had "blood in stool."[7]  Furthermore, everyone saw the razor blade.  If Mr. Jackson had not swallowed it, certainly RCC would have obtained it and preserved it for evidence.

In subsequent disciplinary proceedings, RCC asserted that Mr. Jackson had not obtained the body camera from an RCC officer but instead had stolen the body camera from an empty room.[8]  But RCC itself acquitted Mr. Jackson of theft.[9]  If RCC actually believed that Mr. Jackson stole the body camera from an empty room (unlikely, given Mr. Jackson's confinement), RCC would not have acquitted him.

Defendants contend that the body camera did not record the incident in question, but the body camera apparently worked because RCC managed to obtain from it other recordings that Mr. Jackson made.  Again, undersigned counsel has repeatedly asked, in written discovery requests as well as in letters to opposing counsel, for any recordings, in their complete unedited format, of Jackson for the 24 hours before and after the July 24, 2017 incident described in the amended complaint.  No one has responded to her requests. See attached Exhibit F.

---

[7] See attached Exhibit B: 2017-08-14 Healthcare Request Form ("blood in stool"); 2018-01-30 LSU Health Lallie Kemp Medical Center ("History of ingestion of razor blades in the past and rectal bleedings since that time during the last six months. Apparently, x-rays did not reveal any foreign body the last time x-rays were done.").

[8] See attached Exhibit E: 2017-09-05 First Step Response Form for incident dated 2017-07-24.

[9] See attached Exhibit E: 2017-07-24 Disciplinary Report for incident dated 2017-07-24 (on the disciplinary report signed by RCC's disciplinary board, both "Theft" and Rule Number "22" are stricken).

For the reasons, among possible others, that the existing video evidence raises more questions than it answers, Defendants are not entitled to summary judgment on Count 1.

### 7.   "Defendants are entitled to qualified immunity."

Mr. Jackson does not dispute that the doctrine of qualified immunity, where it applies, shields an officer from liability.  But Defendants have not stated a basis for applying the doctrine here.

### a.   Goings, Spears, Major Mizell (Counts 1, 3, 4, and 6)

Defendants' sole argument in support of applying the doctrine of qualified immunity to Goings, Spears, and Major Mizell is Defendants' assertion that "[t]he video evidence attached definitively proves that neither Goings, Spears, or Mizell provided Plaintiff with bug spray or a razor to self harm, but rather evince that Plaintiff attempted to harm himself.  Defendants acted appropriately and quickly."  Doc. 97-1 at 37.

As already explained, the existing video evidence raises more questions than it answers—and no one has responded to undersigned counsel's repeated requests for any recordings, in their complete unedited format, of Jackson for the 24 hours before and after the July 17, 2017 and July 24, 2017 incidents described in the amended complaint.  Goings, Spears, and Major Mizell are not entitled qualified immunity.

### b.   Dr. Cleveland (Count 2)

Defendants' sole argument in support of applying the doctrine of qualified immunity to Dr. Cleveland is Defendants' assertion that "Plaintiff has failed to show that Dr. Cleveland withheld medical treatment."  Doc. 97-1 at 39.

As already explained, Defendants do not dispute that Dr. Cleveland, as RCC's medical director, was responsible for Mr. Jackson's medical care.  They also do not dispute that Dr. Cleveland knew that Mr. Jackson's mental state was fragile. The existing evidence shows that between the July

24, 2017 incident and his mother's passing on September 7, 2017, Mr. Jackson made at least five formal requests to speak to a mental health professional.[10]  After his mother's passing on September 7, 2017, Mr. Jackson's pleas became more urgent.  Between September 7, 2017 and March 5, 2018, he made more than a dozen formal requests to speak to a mental health professional, including in a personal letter to Dr. Cleveland.[11]  Dr. Cleveland ignored Mr. Jackson.  Defendants do not address these facts, much less offer evidence to contradict them. Dr. Cleveland is not entitled to qualified immunity.

## 8. "Plaintiff is not entitled to prospective injunctive relief." (Counts 1, 2, 3, 4, and 6)

Defendants devote the last four pages of their memorandum in support of their motion for summary judgment to the argument that Mr. Jackson is not entitled to prospective injunctive relief. Doc. 97-1 at 40-44 ("[N]o prospective injunctive relief can be granted under 42 U.S.C. § 1983 in the absence of a violation of federal law.").

Mr. Jackson would like prospective injunctive relief, but he has not moved for it.  The Court need not decide here whether Mr. Jackson is entitled to prospective injunctive relief because he is likely to succeed on the merits of his claims.

But to be clear, to the extent Mr. Jackson seeks eventual injunctive relief for his § 1983 claims, it is against Warden Bickham only, because Warden Bickham is the current warden of RCC and oversees RCC's operations. Indeed, the only relief that Mr. Jackson can obtain against Warden Bickham in his official capacity is declaratory and injunctive.  That request is proper.

To the extent Mr. Jackson seeks eventual injunctive relief for his ADA claim, it is against LA DPS&C only, because LA DPS&C is the only party that can remedy RCC's ADA violations.  That request is also proper.

---

[10] See attached Exhibit B.

[11] See attached Exhibit B.

**Conclusion**

For the reasons stated, the Court should deny Defendants' motion for summary judgment and order Defendants to respond to Mr. Jackson's discovery requests so that he may properly present his case at trial.


June 5, 2022

Respectfully submitted,

*/s/ Alysson Mills*
Alysson Mills
Mills & Amond LLP
650 Poydras Street, Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
amills@millsamond.com

*Court-appointed counsel for Brandon Jackson*



Attachments:
Response to Defendants' Statement of Uncontested Facts
Exhibit A: Mr. Jackson's grievances
Exhibit B: Mr. Jackson's healthcare requests forms
Exhibit C: Defendants' training transcripts
Exhibit D: Defendants' policies and directives
Exhibit E: Disciplinary reports
Exhibit F: Declaration of counsel

CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

I further certify that I mailed the foregoing document by first-class mail to:

Brandon Jackson, #451010
Rayburn Correctional Center
Sleet Unit R-4 #1
27268 Highway 21 N
Angie, Louisiana 70426

June 5, 2022                    */s/ Alysson Mills*
                               Alysson Mills