## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**BRANDON KEITH JACKSON**                           CIVIL ACTION

**VERSUS**                                          NUMBER:  17-13503

**ROBERT C. TANNER, <u>ET</u> <u>AL</u>.**                  SECTION: "S" (5)

<u>**ORDER AND REASONS**</u>

Before the Court is the Motion for Summary Judgment filed by Defendants, the Louisiana Department of Public Safety and Corrections ("DPSC"), Robert Tanner, E. "Dusty" Bickham, Robert Goings, Ronnie Spears, Darryl Mizell, and Dr. Robert Cleveland.  (Rec. doc. 97).  Plaintiff opposes the motion, (Rec. doc. 110), and Defendants have filed a reply.  (Rec. Doc. 115).   Also before the Court is Plaintiff's Motion to Compel (Rec. doc. 88) and Defendants' corresponding Motion to Stay Discovery.  (Rec. doc. 107).  Both motions are opposed.  (Rec. docs. 93, 107).  Having reviewed the pleadings and the case law, the Court rules as follows.

## I.      Factual Background

Plaintiff Brandon Keith Jackson filed this lawsuit in proper person on November 22, 2017 asserting claims under 42 U.S.C. § 1983 and various other federal statutes.[1]  Plaintiff claims that Defendants violated his rights under the Constitution in numerous ways as further detailed below.  The two main incidents underlying this lawsuit, occurring on July 17 and 24, 2017 – involve allegations that Defendants Goings and Spears encouraged Plaintiff to commit suicide in order to save his mother's life and even provided him the means to do so.

## II.     Standard of Review

---

[1] This Court granted Plaintiff's motion to appoint counsel on December 9, 2020.  (Rec. doc. 49).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta &*

2

*Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Further, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

## III.    Law and Analysis

The parties agree that after much motion practice, the following claims remain:

1. Count 1 – Unreasonable conditions of confinement against Defendants Goings and Mizell in their individual capacities.

2. Count 2 – Deliberate indifference to a serious medical need against Dr. Cleveland in his individual and official capacities and against Defendant Bickham in his official capacity;

3. Count 3 – Excessive force against Defendants Goings, Spears, and Mizell in their individual capacities and against Defendant Bickham in his official capacity;

4. Count 4 – Retaliation against Defendants Goings, Spears, Mizell, and Dr. Cleveland in their individual capacities and against Defendant Bickham in his official capacity;

5. Count 5 – ADA and RA claims against DPSC;

6. Count 6 – Discrimination against Defendants Goings, Spears, Mizell, and Dr. Cleveland in their individual capacities and against Defendant Bickham in his official capacity; and,

7. Count 7 – Supervisory liability against Defendant Robert Tanner (former Warden at Rayburn Correctional Center) in his individual capacity.

## A.      Exhaustion as to Counts 2, 3, 4, and 6

Plaintiff is an offender sentenced to the custody of the DPSC.  At all times relevant hereto (including at the time he filed this lawsuit), Plaintiff was incarcerated in the Rayburn Correctional Center ("RCC") in Angie, Louisiana.  Defendants first argue that Plaintiff failed to exhaust the claims raised in Counts 2, 3, 4, and 6.

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Federal courts have taken a strict approach to the exhaustion requirement.  Exhaustion must be proper and in full compliance with applicable prison procedural rules and deadlines; substantial compliance with administrative procedures is insufficient.  *Guy v. LeBlanc*, No. 13-CV-2792, 2015 WL 65303 at *9 (E.D. La. Jan. 5, 2015) (citing *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001)).   "A prisoner exhausts all available administrative remedies for a claim only if he or she (1) completes the prison's grievance process (2) in a manner 'sufficiently specific to give "officials a fair opportunity to address the problem that

will later form the basis of the lawsuit." *Petzold v. Rostollan*, 946 F.3d 242, 254 (5th Cir. 2019) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007)).   Exhaustion of administrative remedies is essentially a condition precedent to bringing suit.  *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).   "Pre-filing exhaustion is mandatory, and the case must be dismissed if available administrative remedies were not exhausted."  *Id.*

The Supreme Court has held that to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules," *Woodford v. Ngo*, 548 U.S. 81, 84 (2006) – rules that are defined not by the PLRA, but by the prison grievance process itself.   Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust."  *Jones*, 549 U.S. at 218.

Failure to exhaust is an affirmative defense, for which the defendant has the burden of proof.  *Jones v. Bock*, 549 U.S. 199, 216 (2007).   "At the summary-judgment stage, . . . defendants 'must establish beyond peradventure all of the essential elements of the defense of exhaustion to warrant summary judgment in their favor.'"  *Wilson v. Epps*, 776 F.3d 296, 299 (5th Cir. 2015) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).

Louisiana has a two-step Administrative Remedy Procedure ("ARP") for inmates that they are required to use before filing suit in district court, and a prisoner has not exhausted until he has completed both steps.   *See Dillon*, 596 F.3d at 265-66 (citing La. Adm. Code tit. 22 § 325(A)).  At the first step, the inmate initiates the process by submitting a grievance letter to the Warden briefly setting out the basis for his claim and the relief sought within 90 days of the alleged event or incident subject to the complaint.  *See id.*  The Warden then has 40 days to respond.  *See id.*  If the inmate is dissatisfied with the warden's

response, or no response is received within the 40-day time period, the inmate may proceed to the second step and appeal to the Secretary of the DPSC.  *See id.*  The Secretary has 45 days to respond to that request for review.  *Campfield v. Tanner*, No. 10-CV-1151, 2011 WL 4368723 at *2 (E.D. La. Aug. 16, 2011), *adopted with modification*, 2011 WL 4368842 (E.D. La. Sept. 19, 2011).  If the inmate is not satisfied with the second step response, he may then file suit in the appropriate district court.  La. Admin. Code tit. 22, Pt. I, § 325(G)(2)(b).

Plaintiff submitted a grievance on July 31, 2017: RCC-2017-573.  (Rec. doc. 97-6 at pp. 8-21).  The only incidents of which plaintiff complains in RCC-2017-573 occurred on July 17 and July 24, 2017.  *Id.*  Plaintiff acknowledges that RCC-2017-573 is the ARP he submitted in connection to this lawsuit.  (Rec. doc. 1 at p. 3).  Indeed, Plaintiff attached only RCC-2017-573 to his original complaint.  (*Id.* at pp. 4-5).

Attached to Defendants' memorandum as Exhibit F is an affidavit by RCC's Executive Staff Officer, Cynthia Crain Sumrall, who has custody of, and personally searched RCC's ARP records for filings by Plaintiff.  (Rec. doc. 97-5 at ¶¶ 2, 9, 13).  Sumrall testified that Plaintiff failed to exhaust his administrative remedies as to Counts 2, 3, 4, and 6.  (*Id.* at ¶¶ 14, 16-18).  Sumrall identified three ARPs that were filed during July and August 2017 and October 2018, namely RCC-2017-518, RCC-2017-573, and RCC-2018-719.  (Rec. doc. 97-6).  A review of ARP RCC-2017-518 reveals that Plaintiff withdrew this ARP effective July 31, 2017.  (*Id.* at pp. 2-7).  Plaintiff then filed ARP RCC-2018-719 on October 1, 2018.  (*Id.* at pp. 22-40).  However, it related to an incident occurring September 26, 2018 and is not addressed in Plaintiff's complaint.  (*Id.*).  Accordingly, ARP RCC-2018-719 is not at issue in this litigation.  Further, Plaintiff has had the opportunity to amend his complaint on two

6

occasions and has never addressed the incident raised in ARP RCC-2018-719 in any of his filed complaints.  (Rec. docs. 1, 25, 61).[2]

Accordingly, RCC-2017-573 is the only operative ARP in this lawsuit.  Plaintiff submitted that ARP to RCC in connection with incidents that occurred on July 17, 2017, involving Robert Goings, and on July 24, 2017, involving Ronnie Spears.  RCC-2017-573 makes no mention whatsoever that Defendant Cleveland was deliberately indifferent to his medical needs; that Defendants Goings, Spears, and Mizell retaliated against Plaintiff by using excessive force on October 1, 2018; that Defendants Goings, Spears, Mizell, and Cleveland retaliated against Plaintiff; or that Defendants Goings, Spears, Mizell, and Cleveland discriminated against Plaintiff.  (Rec. doc. 97-6 at pp. 8-21).  Moreover, Plaintiff makes no request to Defendant Bickham implicating any injunctive relief related to these claims.  (*Id.*).

After a review of the controlling ARP and given Sumrall's documented search for any exhausted and relevant ARP, the Court finds that the evidence corroborates Defendants' assertion that Plaintiff did not exhaust Claims 2, 3, 4, and 6 before filing this lawsuit.  The affidavit, made from personal knowledge and Sumrall's review of the records, reveals that no material fact exists regarding Plaintiff's failure to exhaust administrative remedies as to Counts 2, 3, 4, and 6.  (Rec. doc. 97-5).  Plaintiff was required to comply with RCC's administrative remedy procedure and failed to do so with regard to these claims.  Accordingly, there is no genuine issue of material fact as to Plaintiff's failure to exhaust

---

[2] Plaintiff also argues that there is evidence in the record of another ARP:  RCC-2017-869, filed November 27, 2017.  (Rec. doc. 110-2 at pp. 3-6).  However, Plaintiff makes no mention of this ARP until the filing of his opposition memorandum.  The Court thus finds that this ARP is also not at issue in this lawsuit.

administrative remedies regarding Counts 2, 3, 4, and 6.  Thus, the Court finds that these claims must be dismissed for failure to exhaust.[3]

To the extent that Plaintiff requests monetary, declaratory, and injunctive relief from Defendant Bickham in his official capacity as it relates to the unexhausted claims, those claims must also be dismissed for failure to exhaust.  Plaintiff only added Defendant Bickham, RCC's current warden, when he filed his second amended complaint.  (Rec. doc. 61).  Plaintiff asserts claims against Bickham in his official capacity.  (*Id.*).  In her affidavit, Sumrall affirmed that RCC did not receive any ARPs from Plaintiff related to Bickham or to any claim enumerated in Plaintiff's second amended complaint as to Counts 2, 3, 4, and 6, with the exception of ARP RCC-2018-719.  (Rec. doc. 97-5).  However, as noted above, ARP RCC-2018-719 is not at issue in this lawsuit, and Plaintiff has never addressed that ARP in this suit despite having filed two amended complaints.  Any request for monetary, injunctive, or declaratory relief with regard to Counts 2,[4] 3, 4, and 6 are therefore dismissed with prejudice as unexhausted.[5]

### B.    Plaintiff's Claims under the Americans with Disabilities Act and the Rehabilitation Act (Collectively, "the ADA")

Title II of the Americans with Disabilities Act provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected

---

[3] Plaintiff maintains that several other ARPs outline the facts that he brings in Counts 2, 3, 4, and 6.  However, Plaintiff also does not raise these ARPs in his complaint, nor does he attach them to that document.

[4] Given that this Court finds that Plaintiff failed to exhaust Count 2, it need not address that claim on the merits, *i.e.*, whether Defendant Cleveland was deliberately indifferent to Plaintiff's medical needs.

[5]   In *Dawson Farms, L.L.C. v. Farm Service Agency*, the Fifth Circuit stated, "Failure to exhaust 'usually results in a dismissal without prejudice,'" but with prejudice dismissal is warranted when it is "too late" for the plaintiff to exhaust.  504 F.3d 592, 607 (5th Cir. 2007).  Here, Plaintiff's 90-day window to submit a grievance letter to the Warden briefly setting out the basis for his claim(s) and the relief sought for the alleged event(s) or incident(s) complained of has indisputably come and gone.

to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides in relevant part: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Title II of the ADA and Section 504 of the RA "have identical remedial schemes" and "are generally interpreted interchangeably[.]" *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 573-74 (5th Cir. 2018) (citations omitted). To demonstrate a violation of either Title II of the ADA or Section 504 of the RA, "a plaintiff must prove '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.'" *Id.* at 574.

Defendants first argue that Plaintiff does not have a qualifying disability because he has not alleged that his anti-social disorder, bipolar disorder, depression, and anxiety, (Rec. doc. 61 ¶ 97), limit his ability to engage in "major life activities." *Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011). This Court finds otherwise. Major life activities include "'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Id.* Plaintiff points to – and this Court has reviewed – sufficient evidence demonstrating that his disabilities affect his major life activities. *See, e.g., Epley v. Gonzalez*, 860 F. App'x 310, 313 (5th Cir. 2021) ("Epley has alleged sufficient facts that . . . demonstrate that his PTSD and TBI substantially limit his ability to think and sleep. In addition to describing the symptoms that these conditions cause – which include 'migraine attacks, confusion during stressful situations, sleeping disturbances, . . . anxiety and panic

attacks, vivid and distressing flashbacks and nightmares' – his factual allegations illustrate how these conditions affected his life at the time of the underlying incident.").  For example, Plaintiff's July 31, 2017 Healthcare Request Form states: "I am having serious problems"; his August 10, 2017 Healthcare Request Form reveals "[s]erious mental problems, anxiety, paranoid."; his August 13, 2017 Healthcare Request Form states, "I have anxiety, paranoid, can't eat. . . . Mental Problem."; the August 29, 2017 Doctor's Call Form reveals "[a]nxiety & paranoid. Mental health med review."; and his December 17, 2017 Healthcare Request Form reveals, "I can not do my day to day [sic] activities without the meds that works [sic] for my body."  (*See, e.g.,* Rec. doc. 110-3).

Defendants also maintain that Plaintiff cannot establish the second and third prongs under the ADA.  Defendants argue that Plaintiff points to no evidence that he has been denied medical treatment because of his mental health.  In other words, they maintain that Plaintiff sets forth no evidence that his mental health was the reason that RCC employees allegedly denied him medical treatment.  Rather, they contend, Plaintiff bases his ADA/RA claim on allegations that he was provided inadequate medical care; particularly, the alleged failure of Defendant Cleveland to prescribe him Wellbutrin because Plaintiff, a non-medical professional, thought that is what he ought to be prescribed based on his past medical care. (Rec. doc. 61 at ¶ 41).  Plaintiff's claims in this regard fail because he is ultimately complaining only about the adequacy of his medical treatment.  *See, e.g., Hale v. Cnty. Bd. of Supervisors*, Civ. No. 1:14-cv-61, 2017 WL 10912269 (S.D. Miss. Jan. 31, 2017) (dismissing plaintiff's ADA and Section 1983 because plaintiff merely disagreed with his medical treatment), *report and recommendation adopted*, 2017 WL 1073376 (S.D. Miss. Mar. 21, 2017), *aff'd*, 8 F.4th 399 (5th Cir. 2021).  Moreover, the Health Care Request Forms

(HRCFs") attached to Plaintiff's opposition reveal that on every occasion he filed a request to see a doctor or a mental healthcare provider, he saw one. (Rec. doc. 110-3).

Plaintiff alleges that the evidence shows that between the July 24, 2017 incident and his mother's passing on September 7, 2017, Plaintiff made at least five formal requests to speak to a mental health professional. (Rec. doc. 110-3). After his mother's passing on September 7, 2017, Plaintiff alleges that his pleas became more urgent. Between September 7, 2017 and March 5, 2018, he made more than a dozen formal requests to speak to a mental health professional, including in a personal letter to Defendant Cleveland. (*Id.*). Plaintiff contends that RCC's employees ignored him but still fails to support any claim that his mental health was the reason that RCC's employees allegedly ignored him. To invoke the ADA, Plaintiff must prove that his disability was the reason that RCC employees denied him services while he was incarcerated at RCC.

To the contrary, the evidence that Plaintiff supplied to the Court with his opposition prove exactly the opposite. The HRCFs to which Plaintiff cites and even attaches to his opposition reveal that between July 30, 2017 and March 5, 2018, Plaintiff filed approximately 23 forms. (*Id.*). As noted above, contrary to Plaintiff's assertion that the medical staff ignored him, every HCRF is signed by a screener, a health care professional, or both. (*Id.*). Every HRCF reveals an assessment, comments, and a disposition.[6] If Plaintiff had blank forms that he submitted and were ignored by the medical personnel at RCC, he failed to submit them with his opposition to create a genuine issue of material fact as to whether RCC employees ignored him. The HRCFs support Defendants' claim that RCC employees never denied medical treatment to or ignored him because of his disability.

---

[6] On the majority of the HRCFs, the medical professional even recommends that Plaintiff be referred to "MH," or mental health. (Rec. doc. 110-3).

As noted above, Plaintiff's main complaint is that Defendant Cleveland would not prescribe him Wellbutrin.  Plaintiff wrote a lengthy letter to Cleveland in which he pleaded with Cleveland to prescribe him Wellbutrin.  (*Id.* at p. 15).  That letter was received and stamped on December 12, 2017.  (*Id.*).  Two days later, Cleveland saw Plaintiff due to an HRCF in which Plaintiff only sought "[m]y chronic pain medications re-order, and I need to see mental health." (*Id.* at p. 16).  Plaintiff had completed that HRCF on December 13, 2017, the day after Cleveland had received his letter.  (*Id.*).  As Plaintiff himself recognizes, RCC's mental health records on him date back to 2004 and comprise approximately 750 documents.  (Rec. doc. 110 at p. 17 n.6).  Such records demonstrate that RCC provided Plaintiff with medical care and did not deny him treatment based on his disability.  Indeed, the Fifth Circuit has held that "the ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012).  It has also been found that when a plaintiff's core complaint is incompetent or inadequate treatment for an underlying medical condition, such a complaint does arise to a violation of  the ADA because the ADA does not create a remedy for medical malpractice.  *See Back v. Tex. Dep't of Crim. Justice Inst. Div.*, 684 F. App'x 356 (5th Cir. 2017) (same);  *Hay v. Thaler*, 470 F. App'x (5th Cir. 2012) (upholding summary judgment when the plaintiff complained only of inadequate medical care and disagreement with medical care); *Brown v. Wilson*, Civ. A. No 5:10-CV-181, 2012 WL 6719464, *3 (N.D. Tex. Dec. 27, 2012) (quoting *Moore v. Prison Health Services, Inc.*, 24 F. Supp. 2d 1164, 1168 (D. Kan. 1998), *aff'd*, 201 F.3d 448 (10th Cir. 1999)).  This claim is therefore dismissed because there is no genuine issue of material fact that Plaintiff received adequate medical treatment while incarcerated at RCC.

### C.     Supervisory Liability Against Warden Tanner

Plaintiff sues Tanner – former Warden of RCC – in his individual capacity for supervisory liability, alleging that Tanner failed to train and supervise RCC's employees. (Rec. doc. 61 at ¶ 116).   Specifically, in Count 7, Plaintiff alleges that Tanner "failed to train Goings, Spears, and Dr. Cleveland on how to deal with inmates with serious mental health conditions and on their obligations under the ADA"; "failed to train Major Mizell on his duties to investigate incidents at RCC, including the July 17, 2017 and July 24, 2017 incidents involving Mr. Jackson"; and "failed to supervise Goings's, Spears's, and Dr. Cleveland's interactions with Mr. Jackson, with the tragic result that they have been permitted to punish Mr. Jackson for, and aggravate, his disability." (*Id.* at ¶¶ 116-20).

"A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).   A supervisor may . . . be liable for failure to supervise or train if: "'(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009)).

Liability for failure to train or supervise both require that the defendant has acted with deliberate indifference.   *Porter*, 659 F.3d at 776.   "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal

13

quotation marks omitted) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).  To establish that a state actor disregarded a known or obvious consequence of his actions, there must be "actual or constructive notice" "that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights" and the actor nevertheless "choose[s] to retain that program."  *Id.* (citing *Bryan Cnty.*, 520 U.S. at 407).  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference," because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.* (internal quotation marks omitted).  Without cabining failure-to-train claims in this manner, a standard "less stringent" than deliberate indifference would be employed, and "a failure-to-train claim 'would result in de facto respondeat superior liability.'"  *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

"Plaintiffs suing governmental officials in their individual capacities . . . must allege specific conduct giving rise to a constitutional violation.  This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to the constitutional violations."  *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) (citation omitted).  Moreover, "[p]ersonal involvement is an essential element of a civil rights cause of action."  *Cormier v. Edwards*, No. CV 17-241-SDD-EWD, 2019 WL 2438784, at *8 (M.D. La. June 11, 2019) (citing *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983)).

The evidence does not show that Defendant Tanner was ever personally involved in examining, evaluating, or treating Plaintiff's medical complaints or that Defendant Tanner possesses any qualifications of or expertise as a health care provider, or in any way ever

participated in decision making regarding what treatment Plaintiff would and would not receive.  The evidence also does not demonstrate that Defendant Tanner otherwise had any personal knowledge regarding Plaintiff's medical condition or treatments, let alone does it show that Defendant Tanner exercised any deliberate indifference to Plaintiff's request to be treated with the medication of his choice.  Indeed, there is no evidence that Tanner was a doctor himself or had the professional medical expertise to train and supervise RCC's medical personnel.

Further, the evidence here also does not support the claim that Defendant Tanner was ever personally involved in the day-to-day logistics of investigating Plaintiff's ARP. The evidence does not reveal that Defendant Tanner otherwise had any personal knowledge regarding the incidents of which Plaintiff complains, nor does it show that Defendant Tanner exercised any deliberate indifference in responding to Plaintiff's ARP.

Plaintiff makes conclusory allegations that Defendant Tanner failed to train and supervise Defendant Mizell.  Plaintiff makes no claim nor produces any evidence that Warden Tanner was personally involved in any of the alleged acts or omissions upon which his claims of failure to train or supervise are based.  Plaintiff is also unable to establish through evidentiary support a causal connection between an act of Defendant Tanner and the alleged constitutional violations.  Moreover, Plaintiff cannot establish that Defendant Tanner knew or should have known that any alleged failure to train or supervise Defendant Mizell would result in a violation of Plaintiff's constitutional rights.

Plaintiff argues only that he has not received adequate discovery to refute Defendants' arguments and to support his claims.  Pointing to the evidence in the record, Plaintiff argues that none of the Defendants received training on mental health and the

ADA.  (Rec. doc. 110-4).  However, it is unclear what the training programs that Defendants underwent entailed.  Plaintiff does not explain (and submits no evidence of) what constitutes the "Code of Ethics for Public Servants" or "RCC Monthly Safety Training."  Thus, Plaintiff's claim against Defendant Tanner for supervisor liability fails and will be dismissed as there is no genuine issue of material fat as to the lack of Defendant Tanner's personal involvement.

### D.    The Incidents in ARP RCC 2017-573[7]

These incidents form the basis of Count 1.  Defendants' main argument on this count is that Plaintiff's claims surrounding the events that occurred on July 17 and 24, 2017 are so frivolous and baseless as to be fanciful, fantastical, or delusional and should be dismissed as clearly baseless.  Section 1915(d) gives courts the unusual "authority to 'pierce the veil of the complaint's factual allegations.'"  *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992).  To do so, "a court is not bound, as it usually is when making a determination based solely on the pleadings, to accept without question the truth of the plaintiff's allegations."  *Id.*  The Supreme Court has found that district courts, "who are all too familiar with factually frivolous claims," are best situated to identify such complaints within their discretion.  Courts apply this standard cautiously, but they have indeed dismissed numerous lawsuits on this basis.  *See Denton*, 504 U.S. at 33 (noting that improbable claims may be dismissed on summary judgment); *Taggart v. Office of the Inspector Gen.*, 10 Civ. 5447, 2011 WL 13128214, at *10 (S.D.N.Y. Sept. 22, 2011) (rendering summary judgment to the defendants on the plaintiff's delusional claims of conspiracy).

---

[7] Defendants also refute Plaintiff's claim of retaliation.  As this Court found this claim to be unexhausted, it need not address it.

### 1.   July 17, 2017

On this date, Plaintiff alleges that Defendant Goings forced him to drink a can of insect repellent to save the life of his mother before he was placed on suicide watch. Defendant contends that the allegation that Goings presented Plaintiff with the choice to save his mother's life only if he committed suicide begins as an incredible proposition; that he presented Plaintiff with insect repellant as an instrument with which Plaintiff could choose the latter option stretches believability further; and that Goings did so as part of a conspiracy with the other Defendants (none of whom is alleged to have any motive or ill will toward either of their potential "victims" whatsoever) is more fanciful still. Defendants assert that this claim should be categorized as clearly baseless, and this is especially true in light of Plaintiff's admitted mental illness and his additional allegations against Defendant Spears. Further, Defendants contend that video evidence proves that:

1.    Plaintiff possessed the can of bug spray before being placed in his cell as opposed to the spray being left in the cell by Defendant Goings or any other RCC officer; and

2.    Plaintiff did not ingest the entire can of bug spray at Defendant Goings' behest, but rather did so in order to become high and to damage the tier, his cell, and the cell-monitoring camera.

The video evidence reveals the following. On July 17, 2017, Plaintiff was escorted and placed in his cell around 10:20 a.m. (Rec. doc. 97-4, Ex. A).[8] After the shackles are removed, Plaintiff leans over his bunk and drops the can of insect repellant onto the bed before turning back to the escorting officer to have his foot restraints removed. (*Id.*). He then turns to face the officer to have his wrist restraints removed through the cell door.

---

[8] Plaintiff does not allege or produce evidence that Defendant Mizell was involved in this incident, only that Mizell later protected Defendant Goings from punishment after the incident. Plaintiff also does not present evidence that Mizell "protected" Goings afterward. Because there is no evidence that Mizell was personally involved in the July 17, 2017 incident, any such claims against him in Count 1 are dismissed with prejudice.

(*Id.*).  The officer only then conducts the strip search, and the escorting officers can be seen leaving the tier about 10:23 a.m.  (*Id.*).  Plaintiff's attempt to contradict this evidence by arguing that because the officer strip-searched Plaintiff, he would have found the bug repellent.  But this version of the facts ignores that Plaintiff entered his cell, leaned over his bed, and only then did the officer remove his restraints and conduct the strip search.

Around 10:55 a.m., Plaintiff can be seen pacing around his cell with the can of bug spray in his right hand.  (*Id.*, Ex. B).  Plaintiff appears to be yelling as he paces his cell.  (*Id.*).  Plaintiff then sprays the insect repellent into his mouth.  (*Id.*).  When an officer approaches his cell, Plaintiff retreats and sprays more insect repellent into his mouth.  (*Id.*).  Plaintiff refuses to give the can of insect repellent to the officer and even attempts to spray him.  (*Id.*).  Plaintiff can also be seen deliberately spraying the bug spray onto the tier and onto to the floor directly in front of his cell.  (*Id.*).

Plaintiff can also be seen spraying the bug spray directly at the cell-monitoring camera which monitors cell and tier activity.  (*Id.*).  Once the officer is able to obtain a protective gas mask, he returns to the Plaintiff's cell where Plaintiff finally hands over the can of bug spray.  (*Id.*).  On the body camera footage, Plaintiff can be seen and heard bragging about ingesting the spray, saying, "I ate the whole can . . . I don't give a f***, I ate the whole can!"  (*Id.*, Ex. C).  Plaintiff then goes on to state, "That's all I was trying to do . . . I don't know what the f*** . . . I know I'm high as a motherf***er."  (*Id.*).[9]

Citing a plethora of federal court decisions, Defendants contend that the Court should dismiss Plaintiff's claims on the ground that they are fantastical and baseless.  Having viewed the video evidence, this Court cannot accept Plaintiff's allegations as

_____

[9] This Court viewed the videos produced as a manual attachment with Defendants' motion and finds that the events as outlined by Defendants occurred as stated.

anything but that – bare allegations. Plaintiff insists he is mentally ill and that is evidenced perhaps by his conduct in the video. His allegations may be no more than the product of such illness. Indeed, the video evidence belies Plaintiff's factual allegations. "A complaint lacks an arguable basis in fact when "the facts alleged are fantastic or delusional scenarios or the legal theory upon which a complaint relies is indisputably meritless." *Samford v. Dretke*, 562 F.3d 674, 678 (5th Cir. 2009); *see Melton v. Am. Civil Liberties Union*, No. 3-07-CV-0856, 2007 WL 2263953, at *1 (N.D. Tex. July 30, 2007) (finding claims that the ACLU was "seeking to impose minority rule through the courts, attacking the Boy Scouts of America, defending child molesters, and promoting legislation to have private property rights revoked" were frivolous); *see also Kolocotronis v. Club of Rome*, 109 F.3d 767 (5th Cir. 1997) (finding baseless a complaint describing a government plot to spread the AIDS virus throughout the world); *Simmons v. Payne*, 170 F. App'x 906, 907-08 (5th Cir. 2006) (finding that district court did not abuse its discretion by finding that the assertion of a vast conspiracy by all levels of the state government and federal government was manifestly frivolous because the claims were fanciful, irrational, incredible, and delusional); *Alexander v. Anheuser-Busch*, No. 3:19-CV-00738, 2019 WL 5849371, at *7 (W.D. La. Oct. 24, 2019), *report and recommendation adopted*, No. 3:19-CV-00738, 2019 WL 5858050 (W.D. La. Nov. 6, 2019), *aff'd sub nom. Alexander v. Anheuser-Busch, L.L.C.*, No. 19-30993, 2021 WL 3439131 (5th Cir. Aug. 5, 2021) (finding incredulous a conspiracy claim between law enforcement and the defendants to poison the plaintiff by placing poison into his beer); *Kimberley v. Kardashian*, Civ. A. No. 12-1811, 2012 WL 3257857 (W.D. La. July 9, 2012) (finding delusional claims that Kim Kardashian assaulted complainant after he saw her making a sex tape); *Whitehead v. White & Case, LLP*, Civ. A. No. 12-cv-0399, 2012 WL

1795151 (W.D. La. 2012) (finding baseless claims that alleged a lifelong broad-ranging conspiracy against the plaintiff by scores of federal judges and other persons).

Here, Plaintiff's allegations strain credulity, and this Court has no difficulty – after viewing the video evidence – concluding that Plaintiff's claims against Defendants are patently and inarguably baseless, fanciful, fantastic, and delusional. Plaintiff points to no evidence to support his version of the facts. On the contrary, the video evidence undermines his story. This finding is buttressed by the fact that Plaintiff has filed four other lawsuits in this Court against many of the same Defendants, two of which have been dismissed as frivolous or for failure to state a claim. These baseless claims needlessly consume the resources of the Court and delay justice for citizens with legitimate business before the Court. The video evidence reveals that there is no genuine issue of material fact as to Plaintiff's claim regarding the events that occurred on July 17, 2017.

## 2. July 24, 2017

Plaintiff alleges that on July 24, 2017, while still on suicide watch, Defendant Spears gave him toilet paper with a razor blade inside with which Plaintiff could commit suicide. (Rec. doc. 61 at ¶ 29). Plaintiff also maintains that he was wearing a body camera that he had purchased from an RCC officer for $250.00. (*Id.* at ¶33). In his ARP, Plaintiff claims that he was sold the body camera with the stipulation to "f*ck Lt. Williams over because the body cameras was suppose [sic] to be in his control at all times." (Rec. doc. 97-8 at pp. 18-19).

Plaintiff contends that he used the body camera to film himself swallowing the razor blade. However, this Court has watched the video from RCC and finds that no such thing

occurred.[10]  The Court finds that Plaintiff's allegation that Defendant Spears told Plaintiff, "you wanted to kill yourself b*tch, well here is your chance" as part of a conspiracy with no alleged motive is unlikely in and of itself.  The Court also finds that Plaintiff's claim that he requested toilet paper from Defendant Spears who *instantly* provided him the requested toilet paper with a razor blade *that he just happened to have on his person* is also fanciful. Moreover, the Court finds that when these claims are pitted against the video evidence, Plaintiff's claims against Defendant Spears are baseless.

According to the tier video footage, around 3:35 p.m., Plaintiff can be seen picking up the body camera from his bed.  (Rec. doc. 98).  Defendant Spears approaches Plaintiff's cell, and Plaintiff can be seen holding something in his hand that he appears to swallow. (*Id.*).  Defendant Spears activated his beeper and waited at Plaintiff's cell until back up arrived.  (*Id.*).  Lt. Randall Williams approached the cell to restrain Plaintiff when Plaintiff suddenly smashed the body camera to the ground before approaching the bars to be restrained.  (*Id.*). Defendant Spears' Unusual Occurrence Report matches what the cell monitoring camera captured.  (*Id.*; Rec. doc. 97-8).  Moreover, medical evidence from July 24, 2017 reveals that Plaintiff had an x-ray, but no razor blade was found.  (Rec. doc. 97-9 at p. 105).  To counter this evidence, Plaintiff contends that later medical evidence demonstrates that blood was found in his stool.  (Rec. doc. 110-3)  It is axiomatic, however, that numerous medical conditions can cause blood in a person's stool, and one need not swallow a razor blade to create such a condition.  Moreover, Plaintiff contends that "everyone saw the razor blade."  (Rec. doc. 110 at p. 22).  But there is no citation to any

---

[10] The body camera captured Plaintiff in a self-gratifying situation.  (Rec. doc. 98).  The Court admonishes the parties that the type of graphic contained in the manual attachments should be accompanied by a warning to the Court and any opposing counsel.

evidence for this general conclusion, and even had "everyone s[een] the razor blade," he does not produce evidence that anyone saw him swallow it.

The Fifth Circuit and courts in this district have dismissed out of hand allegations similar to those of Plaintiff. *Baker v. Moore*, 3 F.3d 439, 1993 WL 347226 (5th Cir. Aug. 19, 1993) (upholding finding that the plaintiff's lawsuit was clearly baseless that prison guards were poisoning him); *Taylor v. Quarterman*, Civ. A. No. 5:09-CV-182, 2010 WL 2671457 (N.D. Tex. June 29, 2010), *report and recommendation adopted*, 2011 WL 588753 (N.D. Tex. Feb. 10, 2011) (adopting report and recommendation that dismissed the plaintiff's claims as clearly baseless that spirits put a spell on him to swallow a razor). After viewing the video evidence and reviewing the case law, the Court finds that Plaintiff's allegations of what occurred on July 24, 2017 are baseless and delusional, and summary judgment is warranted in favor of Defendants as to the events that occurred on July 24, 2017.[11]

## IV.    Conclusion

For the foregoing reasons,

**IT IS ORDERED** that the Motion for Summary Judgment filed by Defendants the Louisiana Department of Public Safety and Corrections, Robert Tanner, E. "Dusty" Bickham, Robert Goings, Ronnie Spears, Darryl Mizell, and Dr. Robert Cleveland (Rec. doc. 97) is **GRANTED**, and Defendants are entitled to summary judgment as to Counts 1-7 – the only remaining claims – of Plaintiff's Second Amended Complaint.

All other pending motions are **DISMISSED AS MOOT**.

---

[11] Defendants also assert that they are entitled to qualified immunity. Because the Court has resolved the motion on the foregoing grounds, it need not reach this issue.

New Orleans, Louisiana, this __26th__ day of _____August_____ __2022__

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**